**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                                            No.  CR-02-197 MV

RENATO GASTELUM CARRASCO,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Renato Gastelum Carrasco's Motion to Suppress Evidence Illegally Seized **[Doc. No. 16]**.  The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the motion is well taken and will be **GRANTED**.

### BACKGROUND

On January 6, 2002 at 11:26 a.m., Gallup Police Officer Owen Peña, who was sitting in a marked patrol car on West Aztec Avenue in Gallup and aiming his radar gun at passing cars, observed a 1993 Chevrolet Cavalier traveling at 45 miles per hour in a 25 miles per hour zone.  The driver of the car was Lena Martinez, and Defendant was her passenger.  Officer Peña pulled the car over into the parking lot of a laundromat on West Aztec Avenue, and turned on his video camera.[1]

---

[1] During the evidentiary hearing on the instant motion, the Government submitted as evidence the videotape of the encounter between the officers and Lena Martinez and Defendant. The Court has viewed the videotape, and has resolved factual disputes between the parties based upon its own viewing of the videotape.

Officer Peña approached the car and began questioning Lena Martinez. He asked her for her driver's license, proof of ownership and insurance documents. Lena Martinez provided her vehicle registration, but informed Officer Peña that she did not have her license or insurance documents.

Officer Peña returned to his patrol car and radioed to the police dispatcher the identifying information that Lena Martinez had given him. Approximately five minutes later, the dispatcher informed Officer Peña that Lena Martinez's driver's license had been suspended and that there was an outstanding bench warrant for her based on her failure to appear in magistrate court on a misdemeanor offense.

Officer Peña then re-approached Lena Martinez's car, informed Lena Martinez that she was under arrest on the outstanding warrant, and instructed Lena Martinez to exit the car. Although she questioned the validity of the warrant, Lena Martinez was cooperative and did not resist arrest. Lena Martinez asked Officer Peña not to have her car towed, and requested that Defendant be permitted to drive it home. Officer Peña asked Lena Martinez questions about Defendant, including his name and whether she knew if he had a valid driver's license. Lena Martinez responded that she knew Defendant's nickname and that Defendant did not have a driver's license. Officer Peña stated that he could not allow an unlicensed driver to drive the car. Officer Peña then placed Lena Martinez in handcuffs and he and Sergeant Francie Martinez, who arrived at the scene to assist Officer Peña, placed her in the back seat of Officer Peña's patrol car.

Officer Peña and Sergeant Martinez then approached the passenger side of Lena Martinez's car. Officer Peña knocked on the closed window and made a motion to Defendant, which, from the videotape, appears to have been signaling Defendant to exit the car. Defendant attempted to open the front passenger side door, which would not open, and then motioned toward the rear passenger

side door. Sergeant Martinez opened the rear passenger side door. As he did so, Defendant was able to open the front passenger side door, and exited the vehicle.

The entire encounter between the officers and Defendant was conducted in a combination of Spanish and English. From the videotape, it appears that Defendant, whose first language is Spanish, speaks and understands virtually no English, and that the officers speak and understand virtually no Spanish. Often during the videotape, there appears to be confusion caused by this language barrier.

Officer Peña asked Defendant for identification. Defendant responded that he did not have any identification with him. Officer Peña asked Defendant his name, where he lived, and why he was in Gallup. Defendant identified himself as Renato Gastelum and stated that he lived in Phoenix and was visiting friends in Gallup, gesturing towards Lena Martinez. Officer Peña gave Defendant a pen and paper and asked him to write down his name and date of birth. Defendant complied, and Officer Peña radioed Defendant's information to the police dispatcher.

Thereafter, Officer Peña asked Defendant where he was staying in Gallup. Defendant told him that he was staying with Lena Martinez's brother, but that he did not know the address. Officer Peña told Defendant that Sergeant Martinez would give him a ride there "after we get done." Defendant motioned toward Sergeant Martinez and asked, "You?" Sergeant Martinez responded affirmatively, and Defendant appears to have then nodded his head.

Sergeant Martinez asked Defendant whether he was carrying any knives or guns. Defendant replied that he was not. Sergeant Martinez then instructed Defendant to turn around and raise his hands. Defendant did so. Sergeant Martinez proceeded to conduct a pat-down search of Defendant. Sergeant Martinez felt a bulge in Defendant's right jeans pocket and asked Defendant what it was. Defendant replied that it was money. According to the Government, Defendant then took out of his

pocket a wad of folded bills, later determined to amount to $168. According to Defendant, Sergeant Martinez reached into Defendant's jacket and pulled out the money. It is not clear from the videotape who actually removed the money, but it did end up in Sergeant Martinez's hands. Sergeant Martinez held up the bills to show them to Officer Peña, who was at his patrol car speaking with Lena Martinez. Officer Peña commented to Lena Martinez that her friend had quite a bit of cash on him, and asked her why. She replied that she did not know.

Sergeant Martinez continued his pat-down search of Defendant, and felt something in his left jacket pocket. Sergeant Martinez asked him what was in his pocket. Defendant initially said that he did not know, as the jacket was not his. In a combination of English and Spanish, the officers further questioned Defendant and Defendant provided answers to their questions, ultimately telling them that the jacket was indeed his. Officer Peña ordered Defendant to remove the item from his pocket. Defendant did so, and pulled out a clear plastic bag containing what was ultimately found to be two ounces of loose rocks of crack cocaine. The officers then placed Defendant under arrest, instructed him to turn around and place his hands behind his back, handcuffed him, and called for a canine unit. Later, Defendant was placed in Sergeant Martinez's patrol car.

On February 13, 2002, Defendant was indicted on one count of possession with intent to distribute more than 50 grams of cocaine base **[Doc. No. 10]**. On April 15, 2002, Defendant filed a Motion to Suppress Evidence Illegally Seized **[Doc. No. 16]**, stating that the officers' detention and questioning of him and their pat-down search of his person were illegal, because: (1) the detention and questioning were not supported by a reasonable suspicion of criminal activity; (2) the pat-down search was not supported by a reasonable suspicion that Defendant was armed and dangerous; and (3) the pat-down search exceeded permissible boundaries. The Government responded on April 29,

2002 **[Doc. No. 17]**, and Defendant filed his reply on May 13, 2002 **[Doc. No. 19]**. The Court held an evidentiary hearing on the motion to suppress on June 11, 2002 and June 19, 2002, after which the Court took the motion under advisement.

## DISCUSSION

### I. Questioning of Defendant at the Traffic Stop

The Tenth Circuit has explicitly stated that "[s]topping an automobile and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the detention is brief." *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001). Accordingly, a traffic stop is "'subject to the constitutional imperative that it not be "unreasonable" under the circumstances.'" *Id.* (citations omitted). The reasonableness of a traffic stop, which "is an investigative detention analogous to a *Terry* stop[,] . . . is evaluated in two respects: first, whether the officer's action was justified at its inception, and second, whether the action was reasonably related in scope to the circumstances that first justified the interference." *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994), *cert. denied*, 511 U.S. 1095 (1994).

The parties herein agree that, under this standard, the initial stop was proper. Because Officer Peña observed Lena Martinez speeding, his action of stopping Lena Martinez's car was justified at its inception. The issue in dispute is whether the detention and questioning of Defendant, which occurred after Lena Martinez had been arrested and placed in Officer Peña's patrol car, were reasonably related in scope to the circumstances that justified the interference in the first place. Defendant argues that the officers' detention of him in order to question him about his identification, residence, and reason for traveling, and to run a check on him through police dispatch, were not

reasonably related to the circumstances that justified stopping Lena Martinez's car. The Government contends that the officers were entitled to ask Defendant his name and his connection to Lena Martinez, and acted reasonably in making brief, non-intrusive inquiries to identify the occupants of the car that had been lawfully stopped.

The Supreme Court has held that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). Moreover, the Tenth Circuit has held that an officer conducting a traffic stop may "legitimately ask questions relating to . . . identity and travel plans." *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir. 1989); *see also Zubia-Melendez*, 263 F.3d at 1161 (officer may run computer check, request a driver's license and ask about travel plans). The case law thus suggests that questions reasonably related to the purpose of a traffic stop are permissible and do not constitute an illegal detention. Here, the officers' inquiries were reasonably related to the purpose of the traffic stop, including the determination of whether Defendant would be able to drive Lena Martinez's car, as she had requested. Accordingly, the detention and questioning of Defendant were not unreasonable, and did not constitute a violation of his Fourth Amendment rights.

**II.      Pat-Down of Defendant at the Traffic Stop**

In *Terry v. Ohio*, the Supreme Court recognized that "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." 392 U.S. 1, 24-25 (1968). At the same time, the Supreme Court acknowledged "the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest." *Id.* at 24. In balancing an individual's constitutional rights with

law enforcement safety concerns, the Supreme Court concluded "that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Id.* at 27. Accordingly, the Supreme Court in *Terry* authorized "a limited patdown for weapons where a reasonably prudent officer would be warranted in the belief, based on 'specific and articulable facts,' and not on a mere 'inchoate and unparticularized suspicion or "hunch", that he is dealing with an armed and dangerous individual.'" *Maryland v. Buie*, 494 U.S. 325, 332 (1990) (citations omitted). Thus, in order for a warrantless, pat-down search to comport with the Fourth Amendment, police officers must have a particularized, articulable and reasonable suspicion that the individual they are searching is armed and dangerous. *See United States v. Wald*, 216 F.3d 1222, 1226 (10th Cir. 2000); *United States v. Davis*, 94 F.3d 1465, 1468-69 (10th Cir. 1996).

The Supreme Court also has defined the permissible boundaries of a pat-down search, which must be "strictly circumscribed by the exigencies which justify its initiation." *Terry*, 392 U.S. at 26. A pat-down search "is not [intended] to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (citations omitted). Consequently, such a protective search, permitted without a warrant and in the absence of probable cause, "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Terry*, 392 U.S. at 26. *Terry* does not authorize a "generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons." *United States v. Santillanes*, 848 F.2d 1103, 1108 (1988) (citations omitted). Rather, "'t[he search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing

of the suspect for concealed objects which might be used as instruments of assault.'" *Id.* at 1109 (citations omitted).

It is clear that, "[i]f the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Dickerson*, 508 U.S. at 373. Accordingly, in *Dickerson*, the Supreme Court affirmed the suppression of evidence found by police officers because "the officer's continued exploration of respondent's pocket after having concluded that it contained no weapon was unrelated to 'the sole justification of the search under Terry: the protection of the police officer and others nearby.'" *Id.* at 378 (citations omitted). Similarly, in *Santillanes*, the Tenth Circuit remanded with directions to grant appellant's motion to suppress where the officer "went beyond patting appellant's outer clothing . . . [and] reached into appellant's pockets where he discovered a beer can and a roll of money." 848 F.2d at 1109. The Tenth Circuit explained that the officer's conduct could not "be considered minimally intrusive", but rather "exceeded the scope of a permissible frisk and consequently violated appellant's Fourth Amendment rights." *Id.*

Defendant herein argues that the pat-down search conducted by Sergeant Martinez and Officer Peña was constitutionally impermissible for two reasons: one, because the officers lacked the requisite reasonable suspicion that he was armed and dangerous; and two, because the pat-down search went beyond what would have been necessary to determine whether he was armed. This Court agrees with Defendant on both bases.

First, there is nothing in the record to suggest that the officers had a "belief, based on specific and articulable facts," that Defendant was armed and dangerous. *Buie*, 494 U.S. at 332. The videotape reveals no actions or movements on the part of Defendant that would have aroused a

reasonable suspicion that he was armed or dangerous. Although it is clear that Defendant had difficulty communicating with the officers, it is also clear that Defendant cooperated with them, answering their questions and following their directions. Officer Peña testified that he was not concerned for his safety based upon Defendant's demeanor during the stop, and that he turned his back on Defendant several times during the stop, which the videotape confirms. Thus, the officers' own conduct during the stop tends to disprove that they were operating under any belief that Defendant was armed and dangerous.

The Government's contention that the pat-down search was justified because Defendant kept his hands inside his jacket pockets is unavailing. The Tenth Circuit specifically has found that the fact that an individual keeps his hands in his jacket pockets on a cold winter day does not amount to evidence of a "particularized basis for suspecting that [such individual] is armed." *Davis*, 94 F.3d at 1469. Indeed, Sergeant Martinez testified that Defendant had his hands in his jacket pockets because it was cold that morning. Moreover, it is not evident from the videotape that Defendant was disobeying any direction from the officers by keeping his hands in his pockets. Accordingly, the fact alone that Defendant kept his hands in his pockets could not have supported a reasonable and articulable suspicion that Defendant was armed and dangerous. Since there is no evidence of a "particularized basis" for the officers to have suspected that Defendant was armed, their pat-down search was impermissible and violated Defendant's Fourth Amendment rights.

Even if the pat-down search had been justified at its inception, the officers did not properly limit their search to Defendant's outer clothing to determine whether he had a weapon. During the pat-down, Sergeant Martinez first felt a bulge in Defendant's right jeans pocket. Although he testified that he could not tell what the bulge was, he also testified that the bulge did not feel like a

weapon -- not like a gun, a knife, or brass knuckles. Sergeant Martinez further testified that Defendant told him that the bulge in his pocket was money. Thus, based upon his own search and Defendant's statement, it strains credulity to suggest that Sergeant Martinez believed the bulge to be a weapon. Accordingly, it was only after Sergeant Martinez determined that Defendant's pocket did not contain a weapon that he either reached into Defendant's pocket, or ordered Defendant to do so and then took the money that was in the pocket from Defendant. The search of Defendant's jeans pocket thus exceeded the boundaries of a protective search for weapons.

After determining that the contents of Defendant's jeans pocket did not in fact contain a weapon, the officers continued their search to the left front pocket of Defendant's jacket, where they found another bulge. Sergeant Martinez testified that he could not identify this second bulge, but that the bulge did not feel like a weapon – again, not like a gun, knife or brass knuckles – and was not heavy like a weapon. Nonetheless, Officer Peña ordered Defendant to remove the contents of his jacket pocket. The search of Defendant's jacket pocket thus also exceeded the scope of a pat-down search for officer safety. Indeed, the officers' conduct suggests as much, as it is not credible that a police officer would allow an individual to reach into his own pocket if the officer feared that there might be a weapon in that pocket.

Moreover, Sergeant Martinez testified that his suspicion was aroused by the money found in Defendant's jeans pocket. This suspicion is unconnected to a pat-down for weapons or officer safety, and rather, suggests that the search of Defendant's jacket pocket which followed was intended to discover evidence of illegal activity. This was an improper basis for the continued search, which should have been terminated once the officers determined that Defendant's clothing did not contain any weapons.

Finally, the warrantless seizure of the contents of Defendant's jacket pocket was not justified by the fact that his pocket contained contraband, as there is no evidence that the identity of the contents of Defendant's pocket was "immediately apparent." *Dickerson*, 508 U.S. at 375 (holding that where a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, the warrantless seizure of that object would be justified by the same practical considerations that apply in the plain-view context). Indeed, the officers testified that they did not know the identity of the contents of Defendant's jacket pocket until after he had removed those contents.

The Government contends that the officers' pat-down of Defendant is not subject to the above-Fourth Amendment analysis, and should instead be found reasonable under the totality of the circumstances, for two reasons: one, the officers were exercising their community caretaker function; and two, the pat-down was a consensual encounter. This Court finds the Government's contentions unavailing.

The Government argues that, unlike officers who are investigating a crime, the officers here were exercising their community caretaker function in giving Defendant a ride home. The search was reasonable, the Government argues, in order to ensure that Defendant had no weapons on his person that he could use to hurt the transporting officer. The Government admits that it has found no case law to support its position that an officer acting in a community caretaker function is subject to a different standard than an officer conducting an investigative stop.

Indeed, the cases cited by the Government are not instructive. *Cady v. Dombrowski*, 413 U.S. 433 (1973), makes only the following mention of a police officer's role as a community caretaker:

-11-

> Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Id.* at 441.  This sentence does not support the Government's argument that the officers' pat-down search was justified.  *United States v. Rodriguez-Morales*, 929 F.2d 780 (1st Cir. 1991), *cert. denied*, 502 U.S. 1030 (1992), is a First Circuit case which used the dicta in *Cady* to admit evidence from a warrantless seizure.  In that case, however, a police officer towed the defendant's vehicle, rather than leaving it abandoned on the side of the road.  Unlike the instant case, *Rodriguez-Morales* involved safety concerns about leaving a vehicle unattended on a highway, and thus provides no guidance here.

Similarly, this Court has found no precedent for declining to apply *Terry* and its progeny to the instant case, assuming *arguendo* that the officers were acting in a community caretaker function. This is not surprising, as the balancing test set forth in *Terry* explicitly accounts for the governmental interest in officer safety.  Accordingly, there is no basis for exempting the officers' pat-down search from the Fourth Amendment analysis formulated by the Supreme Court.

The Government also argues that the pat-down was part of a consensual encounter between Defendant and the officers, and thus does not implicate the Fourth Amendment.  "In determining whether a police-citizen encounter is consensual, 'the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir. 1999), *cert. denied*, 531 U.S. 830 (2000) (citing *Florida v. Bostick*, 501 U.S. 429 (1991)).  Each case "turns on the totality of the circumstances presented."  *Id.* (citations omitted).

The totality of the circumstances as reflected in the record does not support the Government's argument. First, the officers' investigation of Defendant occurred in the context of the arrest of Lena Martinez. The officers communicated with Defendant in the same tone of voice and at the same volume that they used in their questioning and arrest of Lena Martinez.

Moreover, Officer Peña did not ask whether Defendant wanted or needed a ride. Rather, he made a declaratory statement that Sergeant Martinez would give him a ride "after we get done." This statement would not have communicated to a reasonable person that he was at liberty to ignore the "offer" of the ride and go about his business. Rather, a reasonable person would have understood that he was required to stay until the officers "got done," and that he was then obligated to return to the house where he was staying in Sergeant Martinez's police car. The fact that Defendant appears to have nodded his head after Sergeant Martinez confirmed that it was he who would be driving Defendant home does not convert the stop into a consensual encounter. The nod appears to have been an acknowledgment that Defendant understood Officer Peña's instruction, not that he was consenting to further questioning and then a ride.

Nor did the officers ask permission for the conduct of a pat-down search. Rather, Sergeant Martinez instructed Defendant to turn around, with the clear implication that he intended to search him. At that point, no reasonable person would have believed that he was free to refuse the instruction or do anything other than turn around and put his hands in the air, as Defendant did.

The totality of the circumstances thus demonstrates that the encounter between Defendant and the officers was not consensual. Accordingly, the officers were prohibited by the Fourth Amendment from conducting a pat-down search without a reasonable and articulable suspicion that Defendant was armed and dangerous.

## CONCLUSION

The officers' questioning and detention of Defendant were reasonably related to the purpose of the traffic stop, and thus did not constitute a violation of Defendant's Fourth Amendment rights. However, the officers' pat-down search was constitutionally impermissible, because the officers lacked the requisite reasonable suspicion that Defendant was armed and dangerous, and because the pat-down search went beyond what would have been necessary to determine whether Defendant was armed.

**IT IS THEREFORE ORDERED** that Defendant Renato Gastelum Carrasco's Motion to Suppress Evidence Illegally Seized **[Doc. No. 16]** is hereby **GRANTED**.

Dated this 13th day of December, 2002.

MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE

Attorney for Plaintiff:
Sharon Kimball, Esq.

Attorney for Defendant:
Phillip Medrano, Esq.